JERRY HERNANDEZ
ATTORNEY AT LAW
BAR #13021
115 W. HU-ESTA DR.
TEMPE, AZ  85282
(480) 231-3053

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 10-796-02-PHX-NVW |
| | ) | (Assigned to the Honorable Neil V. Wake) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S REQUEST FOR** |
| | ) | **DOWNWARD DEPARTURES** |
| | ) | |
| Brett Christopher Matheson, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES

The Defendant seeks a downward departure based upon the Government's conduct in this case pursuant to §5K2.0.  The Defendant also submits that a downward departure pursuant to §5K2.10 (victims conduct) is appropriate. To these propositions the Defendant now turns.

A.    THE GOVERNMENT'S ROLE IN THE SUB PRIME BUBBLE MITIGATES THE DEFENDANT'S CULPABILITY.

By 2008 27 million mortgage loans, half of all mortgages in the U.S., were weak or

1

subprime by 2008.  Of these, 70% were held by Fannie Mae and Freddie Mac.  <u>Wall Street's</u> <u>Gullible Occupiers</u>, Peter J. Wallison, the Wall Street Journal, October 12, 2011.

What process led the Government to hold 70% of the nations toxic mortgages by 2008?  Precisely what role did the Government play in setting the stage for the events as set forth in the indictment and admitted as true by Brett Matteson?  To what degree should Mr. Matheson's conduct be mitigated by the principal architect (the Government) of the subprime bubble?

The short answers to these questions are that the Government expressly mandated the relaxation of the industry underwriting standards.  Congress and Federal regulatory agencies rejected multiple efforts to curb dangerous lending practices because it was not politically expedient to do so.  The Government also promulgated changes to the rules governing appraisals which dramatically encouraged inflated home loans.  Regrettably, many in Government profited handsomely by tastily encouraged people like Brett Matheson to contravene the laws that he did.

Mr. Matheson will briefly recount the genesis of the subprime bubble.  In doing so he will demonstrate that it would have been almost impossible to have committed this crime without the Government's blessing.  Defendant will borrow heavily from the Book <u>Reckless</u> <u>Endangerment</u>, Morgenson and Rossner, Times Books/Henry Holt and Company (2011).  Unless otherwise noted, most of the substance of the Defendant's argument is contained there.  The Defendant attaches a copy of the book for the courts reference and perusal

2

1   (Attachment #1).

2        The U.S. created Fannie Mae in 1938 to buy mortgages from banks that loaned

3   money to home owners.  It was a depression era creation designed to facilitate home

4   ownership in a devastated America.  In 1968 Lyndon Johnson changed Fannie Mae from a

5   wholly Government agency into a partially private company that issued common stock to

6   public investors.  The agency assigned to monitor the activity of Fannie Mae is/was the

7

8   Department of Housing and Urban Development (HUD).

9

10       In 1992 congress passed the Federal Housing Enterprises Financial Safety and

11  Soundness Act.  The new legislation directed Fannie/Freddie to focus on serving the

12  housing needs of "low income and underserved families".  Specifically, the new legislation

13  specified that 30% of the housing units financed by Fannie/Freddie must go to low and

14  moderate income families, another 30% must go to housing located in inner cities.

15

16       This meant reducing traditional underwriting standards.  The 1992 act encouraged

17  Fannie/Freddie to buy loans from banks where the borrowers had put down 5% or less.

18  Fannie/Freddie were consequently encouraged and far more likely to buy risky loans

19  because they had the congressional good housekeeping seal of approval.

20

21       In October of 1992 the Boston Fed released a study entitled, "Mortgage Lending In

22  Boston:  Interpreting HMDA Data"  The thrust of this publication was that racial bias by

23  mortgage lenders was pervasive.  This study helped change the political landscape in which

24  Fannie, Congress, and the executive branch operated.

25

26

27                                     3

28

1    In essence, this study, and the Federal Housing Enterprises Financial Safety Act

2    became the crux of what would become the centerpiece of the Clinton Administrations

3
4    "National Partnership In Homeownership" Program.  Translation:  loosening underwriting

5    standards and empowering Fannie/Freddie to purchase toxic loans became both an executive

6    and congressional imperative.

7    Six months later the Federal Reserve Board released a 28 page guide for banks

8    entitled, "Closing the Gap, A Guide to Equal Opportunity Lending".  This guide was

9
10   essentially a blueprint demonstrating how banks could relax their underwriting standards to

11   avoid discrimination.  Stated the Boston Fed:  "Institutions that sell loans to the secondary

12   market should be fully aware of the efforts of Fannie Mae and Freddie Mac to modify their

13
14   guidelines to address the needs of borrowers who are low income, live in urban areas, or do

15   not have extensive credit histories".

16   Reckless Endangerment at 36.

17   The impact of the Government's message to the banking community was clear:

18   traditional underwriting standards were a thing of the past.  Mortgage lending is and was

19
20   heavily regulated by the Government, and Fannie Mae is and was the leader in housing

21   finance.  The reality is that as the Government moved further south on the risk curve, so did

22   the market.  And why wouldn't lending institutions gravitate south on the risk curve?  The

23
24   Government's legislation and imperatives meant that any downside risk would be unloaded

25   on the Government.  Besides, in order to stay competitive banks had to adopt the practice of

26

27                                              4

28

1    their competitors, who were lending profligately.

2           In 1993, Fannie Mae launched a new program that would redefine lending practices

3    in the new world order:  "Alternative Qualifying".  This program essentially validated and

4    institutionalized marginal underwriting criteria.  The acceleration towards the subprime

5    

6    bubble was increasing.

7           On May 15, 1996, the Treasury Department was scheduled to release a report

8    detailing the systemic risk posed by Fannie/Freddie.  This report had been prepared by

9    staffers within the Treasury Department.  The report also argued that privatizing the

10   Government's  mortgage giants was an option worth seriously considering.  This report

11   never saw the light of day.

12   

13          Prior to the report's release, Fannie Mae got wind of its release and arranged a

14   meeting at Treasury to influence the content and conclusions of said report.  Present at the

15   meeting was Robert Zoellick, Fannie's Executive Vice President, and Lawrence Summers,

16   Deputy Secretary of the Treasury Department.   Ultimately the Treasury staffers who

17   prepared the report were "persuaded" to substantially water down the tone and conclusions

18   set forth in the reports.  Essentially, the Government sabotaged this attempt to reign in

19   Fannie/Freddy because of the charged political landmine that was the funding of subprime

20   housing.

21          ID at 79-81.

22           In May of 1996 the Congressional Budget Office (CBO) authored a report

23   

24   

25   

26   

27                                              5

28

1  quantifying what the value of Fannie's quasi-Governmental status was worth on the open

2  market.  This report was severely critical of Fannie and noted that  its Government agency

3  status was distorting the market.

4

5        On June 12, 1996 the congressional subcommittee on capital markets, securities,

6  and Government sponsored enterprise held a hearing to consider the CBO report.  During

7  the hearing, as in the reports, the CBO recommended fully privatizing Freddie to protect tax

8  payers from the downside of a market collapse.  Congress decided against privatizing

9  Fannie/Freddie, even knowing the degree to which it was subsidized, the huge exposure they

10 presented to taxpayers, and the types of loans they encouraged the banking community to

11 make.

12

13       Andrew Cuomo became the head of the HUD in 1997.  Stated Mr. Cuomo upon

14 taking office:  "GSE (Government Sponsored Entities) presence in the subprime market

15 could be of significant benefit to lower income families, minorities, and families living in

16 underserved areas".

17

18       ID at 114.

19

20       In 1999 Cuomo directed Fannie/Freddie to increase their subprime lending from

21 42% to 50%.  HUD threatened to impose a $10,000 fine on Fannie/Freddie for each day the

22 50% goal remained unmet.  President Clinton expressly voiced his support of HUD's

23 efforts to strengthen and accelerate subprime lending (emphasis added).

24

25       ID at 116, 117.

26

27                                              6

28

1    In 1999, Congress passed the Financial Services Modernization Act.  The substance

2    of the legislation was the repeat of the Glass-Steagel Act, which was a depression era law

3    designed to limit the risk banks could take.   After the FSMA, the banks were free to invest

4

5    in risky subprime ventures with depositors money, and were encouraged to do so.

6    In November, 2001, the United States top bank regulators allowed ratings agencies

7    like Moody's and Standard and Poor's to redefine risk downward as it pertained to

8

9    securitized mortgages.  This rule, which was promulgated by the Federal Reserve Board, the

10   office of the controller of the currency, the office of thrift supervision, eased bank capital

11   requirements, and gave these securitized subprime mortgages the imprimatur of the ratings

12   agencies and the U.S. Government.

13

14        ID at 133-136, 152.

15        In 2003, under the Bush Administration, Treasury Secretary John Snow testified

16   before the House Financial Services Committee.  The thrust of Secretary Snow's testimony

17   was that Fannie/Freddie needed more stringent oversight to protect the public and financial

18   system.

19

20        ID at 246.

21        Opining that there was no crisis at  Fannie/Freddie, Congress declined to curtail

22   Fannie/Freddie's risk models.  To the contrary, the congressional subcommittee on banking

23   praised Fannie Mae and its mission to subsidize the subprime loan industry.

24

25        ID at 246-247.

26

27                                          7

28

1    Perhaps Government's biggest contribution to the subprime bust came in 1995,

2  When HUD relaxed rules involving appraisals.  Specifically,  HUD eliminated the

3  requirement that appraisers be independent of the banks funding the loan.  Under a new rule

4  designated to streamline regulations, HUD specifically said banks could hire their own

5

6  appraisers.

7    B.    COUNTRYWIDE'S CONTRIBUTION TO THIS MESS MERITS A

8  DOWNWARD DEPARTURE FOR MR. MATHESON.

9

10    Fannie Mae and Countrywide had a special relationship.  Fannie Mae could not

11  underwrite loans, so they needed someone to provide loans in the volume they needed to

12  fulfill their congressional mandate of providing affordable low cost housing.  Countrywide

13  generated the volume to meet this need.  In return for Countrywide's volume, Fannie

14  reduced the fee it charged to guarantee the loans.

15

16    Countrywide in the relevant timeframe set forth in the indictment required no

17  documentation of a borrowers income or assets.  By 2004 Countrywide was the nation's

18  largest mortgage lender.  Countrywide generated 200,000 mortgages a month, with

19  revenues of 8.6 billion a year.

20

21    ID at 190

22  Countrywide was responsible for 26% of the loans Fannie Mae purchased in 2004.

23    ID at 182, 183.

24

25  "In terms of being unresponsive to what was happening, the sticking it out the

26

27                                         8

28

1   longest, and continuing to justify the garbage they were selling, Countrywide was the worst

2   lender," said IRA Rheingold, Executive Director of the National Association of

3   Consumer Advocates.  "And anytime states tried to pass responsible lending laws,

4   Countrywide was fighting it tooth and nail".

5

6   Inside the Countrywide Lending Spree, G. Morgenstern, The New York Times,

7   August 28, 2007.

8

9   In January of 2011 Countrywide agreed to pay Fannie/Freddie 2.8 billion to settle

10  demands for buybacks of flawed home loans.  This amount was in addition to about 3.5

11  billion in such payments already made to Government controlled mortgage firms.

12  B of A's Legal Woes From Countrywide Worse Than Expected, E. Scott Reckard,

13  Los Angeles Times, February 25, 2011.

14

15  C.     LAW

16  Both victim misconduct and Government involvement/facilitation of a crime are

17  cognizable basis to downward depart.

18

19  §5K2.10 provides in pertinent part: "If the victims wrongful conduct contributed

20  significantly to provoking the offense behavior, the court may reduce the sentence below

21  the guideline range to reflect the nature and circumstances of the offense". ......"In addition

22  this provision would normally not be relevant in the context of non-violent offenses.  There

23  may be, however, unusual circumstances in which substantial victim misconduct would

24  warrant a reduced penalty in the case of a non-violent offense".

25

26

27                                            9

28

1    The requested departure for the Government's role in this case is <u>Koon v. United</u>

2  <u>States</u>, 518 U.S. 116 S. Ct. 2035 (1996).  If a particular factor is not mentioned in the

3  guidelines, that does not mean that a departure based on that factor is precluded.  To the

4  contrary, <u>Koon</u> states that "a federal courts examination of whether a factor can ever be an

5  appropriate basis for departure is limited to determining whether the commission has

6  prescribed, as a categorical matter, consideration of the factor".

7  

8    §18 U.S. at 109, 116 S. Ct. 2035.

9    This language would appear to prohibit courts from categorically excluding any

10  

11  departure factor not expressly prohibited by the guidelines.  §5K2.0 (d) does not

12  specifically preclude a departure as the grounds that the Government's conduct/misconduct

13  was related to the guilt of the defendant.

14  

15    D.    ARGUMENT

16    There is little, if any, doubt that Congress, the Executive Branch, Government

17  Regulatory Agencies, and Fannie Mae made the crime Mr. Matheson committed more

18  probable.  The Government collectively loosened underwriting standards, relaxed appraisal

19  rules, and set the tone in the private sector for what would become the subprime bubble.

20  

21    Countrywide, now B of A, contributed mightily to the subprime bubble in general and

22  to this crime in particular.  It should not be lost upon the court that co-defendant Paige

23  Kinney was a Countrywide employee during the time frame set forth in the indictment.

24  

25    Countrywide utilized  its own appraisers for the loans in question.  Countrywide's

26  

27    10

28

1   underwriting department approved all of the loans in question.  How Countrywide can

2   legitimately claim a loss of 20 Million  now is the 20 Million Dollar question.

3

4          Indeed, instant counsel and his investigator have crunched the numbers and arrived at

5    a guideline loss consistent with that agreed to by the parties.  The guideline loss calculation

6   will be more thoroughly addressed in the Defendant's Objection to the Pre-Sentence

7   Report.  For present purposes it is sufficient to say that the guideline loss is the cash back

8   amount less payments on the notes and expenses incident to maintaining the properties.

9

10         Why should Countrywide be able to claim a loss of 20 million?  Their own

11  underwriters and appraisers gave these loans their blessing.  Doesn't it seem wrong to the

12  court that Countrywide would be able to collect a loss amount beyond the cash back amount

13  when they were responsible for determining what these loans were worth?

14

15         To aggravate matters, Countrywide packaged these loans and sold them off, profiting

16  handsomely.  They should not now profit twice from the loans which they themselves gave

17  the "Good Housekeeping Seal of Approval".

18

19         Countrywide, the victim, contributed mightily to the injury they received.  Mr.

20  Matheson should not have to be wholly responsible for that injury.  A downward departure is

21  warranted.

22         E.      CONCLUSION

23

24         The Defendant does not seek to absolve himself for these events by presenting this

25  pleading.  Rather, he asks the court to recognize the inducement provided by the

26

27                                          11

28

1   Government and Countrywide that contributed to the commission of this offense.  The

2   chain of events set forth in this pleading did  not start at the bottom, with people like Mr.

3   Matheson.  Rather, they started at the top with Government and worked their way down to

4

5   the bottom.

6          The Government did promulgate standards that contributed to these events.

7   Countrywide is an essentially unindicted co-conspirator and traduces the traditional

8   meaning of "victim".  For these reasons, the Defendant requests a downward departure based

9   on both factors.

10

11          Respectfully submitted December xx, 2011.

12                                                          s/    JERRY HERNANDEZ

13                                                          _____

14                                                          JERRY HERNANDEZ
                                                            115 W. Hu-Esta Dr.
15                                                          Tempe, Arizona 85282
                                                            BAR #13021

16   I hereby certify that on December xx, 2011,
     I electronically transmitted the attached
17   document to the Clerk's Office using the
     CM/ECF system for filing and transmittal
18   of a Notice of Electronic Filing to the following
     CM/ECT registrants:
19

20   Kevin Rapp
     Assistant United States Attorney
21

22   Copy Mailed to:
     Brett Christopher Matheson
23   Defendant

24

25

26

27                                   12

28